UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JAMIE ARNOLD, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) No. 4:10-CV-352 JAR |
| | ) |
| DIRECTV, LLC, et al., | ) |
| | ) |
| Defendants. | ) |

## **MEMORANDUM AND ORDER**

This matter is before the Court on Defendants DirecTV, LLC, d/b/a DirecTV Home Services and DTV Home Services II, LLC (collectively "DirecTV")'s Motions for Summary Judgment on the Basis That They Were Not the Joint Employer of Mastec Employee Robert Ellendorf (Doc. No. 340), DirectSat Employee Robert Guice (Doc. No. 344), and Multiband Employee Steven Parr (Doc. No. 348), and Plaintiffs' Motion for Partial Summary Judgment on DirecTV, LLC's Employment Relationship (Doc. No. 361). The motions have been extensively briefed and are ready for disposition.[1] For the following reasons, the motions will be denied.

---

[1] Oral argument was held on December 17, 2015. Since that time the parties have worked together on a number of different issues in the case. The motions are now finally submitted for the Court's ruling. The Court has considered the parties' supplemental authority filed in support of their summary judgment motions. On November 7, 2016, DirecTV submitted an order from the United States District Court for the Eastern District of Arkansas granting summary judgment in favor of DirecTV on the joint employer issue. See Roslov v. DirecTV, Inc., Case No. 14-00616, 2016WL6892110 (E.D. Ark. Nov. 4, 2016), appeal docketed, No. 16-4368 (8th Cir Dec. 2, 2016) (Doc. No. 459-1). In response, Plaintiffs submitted orders from the United States District Courts for the Eastern District of Pennsylvania in Field v. DirecTV, Case No. 14-4427 (E.D. Pa. June 20, 2016), and the Middle District of Tennessee in Thompson v. Bruister, Case No. 07-00412 (M.D. Tenn. Apr. 23, 2015), denying cross motions for summary judgment on DirecTV's alleged joint employment and liability (Doc. No. 462). On January 19, 2017, Plaintiffs submitted a memorandum opinion and order from the United States District Court for the Northern District of Iowa in Roeder v. DirecTV, Case No. C14-4091-LTS, 2017 WL 151401 (Jan. 13, 2017), in which the Court denied the parties' cross motions for summary judgment on the employment question and other liability issues (Doc. No. 468).

**I.      Background**

Plaintiffs are former satellite installation and service technicians classified as W-2 employees of one of DirecTV's three Home Services Providers ("HSPs"). The Court conditionally certified Plaintiffs' FLSA claim to proceed as a collective action on four FLSA subclasses (MasTec, Inc. ("MasTec"), Multiband Corporation ("Multiband"), DirectSat USA, LLC ("DirectSat") and DirecTV Home Services)[2] (Doc. No. 121, 134, 200). Plaintiffs have also moved for Rule 23 class action certification to pursue their Missouri state law claims on behalf of a subclass of DTV Home Services II, LLC technicians.[3] Plaintiffs allege that they and other similarly situated technicians were jointly employed by DirecTV under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 et seq., and the Missouri Minimum Wage Law ("MMWL"), Mo. Rev. Stat. §§ 290.500 et seq., and claim entitlement to overtime compensation from DirecTV for violations of the FLSA and MMWL. (See Third Amended Complaint ("TAC"), Doc. No. 279 at ¶¶ 16-28).

DirecTV moves for summary judgment as to the named representatives of the MasTec, Multiband and DirectSat subclasses on the grounds that it was not their joint employer.[4] DirecTV argues it did not hire, fire, supervise, discipline, pay or provide benefits to Plaintiffs or keep their personnel files. Plaintiffs move for partial summary judgment on DirecTV's employment relationship, arguing that DirecTV operates a "fissured employment scheme" designed to allow

---

[2] DirecTV has moved to decertify these subclasses (see Doc. Nos. 319, 326, 333, 352), which motions will be addressed by the Court in a separate order.

[3] Plaintiffs' Motion for Rule 23 Certification (Doc. No. 241) will be addressed in a separate order.

[4] The question of employment is not disputed with respect to the DirecTV Home Services subclass because DirecTV treats those technicians as W-2 employees. Joint employment is also not an issue for the putative AeroSat Rule 23 class since DirecTV has stipulated it is a successor in liability to AeroSat (see Doc. Nos. 375, 439).

the company to shed its role as a direct employer of its technicians while at the same time maintaining tight control over their day-to-day work, from the uniforms they wear to the method, manner, quantity, and quality of the work performed.

**II.     Legal standard**

Pursuant to Federal Rule of Civil Procedure 56(a), a court may grant a motion for summary judgment if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The burden is on the moving party. City of Mt. Pleasant, Iowa v. Associated Elec. Co-op. Inc., 838 F.2d 268, 273 (8th Cir. 1988). Once the moving party demonstrates that there is no genuine issue of material fact, the nonmovant must do more than show there is some doubt as to the facts. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Instead, the nonmoving party bears the burden of setting forth affirmative evidence and specific facts by affidavit and other evidence showing a genuine factual dispute that must be resolved at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex, 477 U.S. at 324. "A dispute about a material fact is 'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Herring v. Canada Life Assur. Co., 207 F.3d 1026, 1030 (8th Cir. 2000) (quoting Anderson, 477 U.S. at 248). In ruling on a motion for summary judgment, all reasonable inferences must be drawn in a light most favorable to the non-moving party. Woods v. DaimlerChrysler Corp., 409 F.3d 984, 990 (8th Cir. 2005). The evidence is not weighed and no credibility determinations are made. Jenkins v. Winter, 540 F.3d 742, 750 (8th Cir. 2008).

"[T]he filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary

determination on the merits." Wermager v. Cormorant Township Bd., 716 F.2d 1211, 1214 (8th Cir. 1983). In determining the appropriateness of summary judgment, "the relevant inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Bingaman v. Kansas City Power & Light Co., 1 F.3d 976, 980 (10th Cir. 1993) (citing Anderson, 477 U.S. at 251-52).

### III. Facts[5]

The following facts are undisputed or uncontroverted, except where noted otherwise:

DirecTV sells and provides digital television and audio programming via satellite. After a customer signs up for DirecTV service, technicians install the receiving equipment in the subscriber's home or business. The receiving equipment, called the DirecTV System, consists of a small receiving satellite dish antenna, one or more digital set-top receivers which are usually leased to the subscriber, and remote controls.

Currently, three groups of technicians install DirecTV services.[6] Individual dealers selling DirecTV services account for approximately 15-20% of new activation installations. Of the remaining 80% of new activation installations, approximately 45% are performed by DirecTV Home Services technicians within DirecTV's owned and operated division, and 55% are performed by Home Services Provider ("HSP") network technicians. According to DirecTV, "the technician installing or fixing a system is 'the face of DirecTV' to the customer." (Deposition of Christopher M. Altomari ("Altomari Depo."), Doc. No. 366-33 at 210:24-211:6).

---

[5] The parties have alleged a substantial number of statements of undisputed material facts, and go to great lengths, in voluminous filings, to dispute the other's facts. The Court has reviewed the statements, the responses, and the supporting documentation, and, where appropriate, will accept facts as supported by appropriate admissible evidence.

[6] DirecTV directly employs over 4,500 technicians and utilizes an additional 10,000 technicians through its HSP network. (See DirecTV 2014 Annual Report, Doc. No. 364-1 at 11)

Currently, DirecTV contracts with three HSPs, namely, MasTec, Multiband, and DirectSat, which together with DirecTV Home Services, make up DirecTV's "fulfillment network." DirecTV installations account for approximately 85% of the revenue received by MasTec; 90% of the revenue received by Multiband; and 95% of the revenue received by DirectSat.[7]

DirecTV's relationships with MasTec, Multiband and DirectSat are governed by a Home Service Provider Agreement and its amendments. The HSP Agreements are drafted by DirecTV and, apart from geographic territory and minor differences in installation rates, are essentially the same in form and content.[8] The Agreements provide that:

> Contractor is an independent contractor authorized during the term hereof to perform and provide Services to DIRECTV. Except as otherwise expressly provided herein, Contractor shall have full control over the methods, techniques, sequences, and procedures of the Services to be provided hereunder. This Agreement is intended to create an independent contractor relationship between the parties for purposes of federal, state and local law, including the Internal Revenue Code of 1986, as amended … Because Contractor and Contractor's employees and subcontractors are not employees, franchisees, agents or otherwise of DIRECTV, Contractor and its employees and subcontractors are not entitled to any benefits to which DIRECTV employees may be entitled under DIRECTV policies or as otherwise required by law, including workers' compensation or unemployment compensation benefits.

Pursuant to the terms of the Agreements, the HSP contractor acknowledges and agrees that "DirecTV customers are customers of DirecTV, not contractor." Each HSP has a defined, non-overlapping territory made up of designated market areas assigned by DirecTV. An HSP cannot install outside its designated market area without DirecTV's permission; however,

---

[7] DirecTV contends these facts do not accurately portray the business relationship between DirecTV and the HSPs. (Defendants' Response to Plaintiffs' SOF, Doc. No. 391 at ¶¶ 23-26). For instance, MasTec has approximately 18,000 employees, only 3,000 of which perform DirecTV satellite television technician services. (Declaration of Lois Beneke ("Beneke Decl."), Doc. Nos. 343-3 and 343-4 at ¶ 9) Further, only 20% of MasTec, North America Inc.'s revenue comes from DirecTV. (Deposition of Jeff Muoio ("Muoio Depo."), Doc. No. 366-40 at 238:24-239:3).

[8] Plaintiffs have submitted the relevant HSP Agreements from 2009 through 2012 as exhibits to their memorandum in support of their motion for partial summary judgment. (See Doc. Nos. 364-5, -6, -7, -8, -10, -11, -12, -13, -14, -15)

DirecTV may have other contractors install within an HSP's designated market area. An HSP may not assign its rights and obligations under the Agreement without DirecTV's written consent; DirecTV may, in its sole discretion, assign its rights and obligations under the Agreement at any time for any purpose. An HSP must provide DirecTV with written notice of its intention to offer employment to an individual known to be then-employed by another HSP within the same or contiguous designated market area.[9]

The HSP agrees to "keep accurate and complete books and records regarding its performance of its obligations under this Agreement," including financial records related to its business obligations under the Agreement, and make those books and records available for DirecTV's review. DirecTV occasionally conducts audits to ensure compliance with the HSP Agreements, as permitted by the Agreements.

The Agreements also contain an "Exclusivity" paragraph, which provides that "[d]uring the term of this Agreement, Contractor agrees that neither it, nor parent entities, subsidiaries or affiliates, shall perform installations or Services for any other provider or distributor of products/services which compete with DirecTV's programming services or any other DirecTV product or service." This exclusivity provision extends to Plaintiffs, in that "a Contractor employee trained to provide Services pursuant to this Agreement shall not simultaneously provide services, on behalf of Contractor, for a cable company or a provider of telephone services, and vice versa."[10]

---

[9] DirecTV asserts the Agreement does not impose any limitation on the HSP's ability to hire such an individual (Defendants' Response to Plaintiffs' SOF, Doc. No. 391 at ¶ 21(f)).

[10] DirecTV notes the Agreements do not limit the HSP contractor's ability to have its technicians perform any other work that does not compete with DirecTV (Defendants' Response to Plaintiffs' SOF, Doc. No. 391 at ¶ 21(d)).

The required elements of a DirecTV installation are set out in a detailed "statement of work."[11] DirecTV controls the fulfillment of its work orders in compliance with its technical requirements set out in its HSP Agreements, policies and procedures, and its "Standard Professional Installation Guidelines." DirecTV pays its HSPs for completed work orders according to a Rate Matrix established by DirecTV. Under the Agreements, HSPs are not entitled to payment for work orders that are not completed, regardless of the reason, and DirecTV has the right to offset, recoup from or charge back directly to HSPs any amount owed by HSPs to DirecTV.

To be eligible for hire, DirecTV requires HSP technicians complete Satellite Broadcasting and Communications Association (SBCA) Certified Installer Training; complete a criminal background check; pass a 9-panel drug test administered by a DirecTV approved vendor; and complete a DirecTV-approved training program.[12] Per the Agreement, DirecTV produces and distributes training materials to all technicians.[13]

---

[11] DirecTV disputes any inference that every item in the statement of work is followed for every installation (Defendants' Response to Plaintiffs' SOF, Doc. No. 391 at ¶ 21(h)).

[12] DirecTV disputes this, and notes that one of its Rule 30(b)(6) witnesses testified it was not necessary for anyone hired as a technician by an HSP to pass any certification before being issued a technician ID number (Deposition of Elizabeth Yates ("Yates Depo.", Doc. No. 366-4 at 41:4-7). In AeroSat's 30(b)(6) deposition, John Sellers testified that AeroSat's technicians were supposed to obtain SBCA certification within 180 days, "but we didn't always comply with that." (Deposition of John Sellers ("Sellers Depo."), Doc. No. 366-41 at 48:11-49:5) DirecTV asserts that several Plaintiffs employed by DirectSat were hired despite their criminal backgrounds and that several Plaintiffs testified on deposition that they did not go through any training program when they were hired by AeroSat, MasTec, Multiband or DirectSat (Defendants' Response to Plaintiffs' SOF, Doc. No. 391 at ¶ 21(j)).

[13] DirecTV does not dispute that it produces and distributes training materials related to the technical aspects of installing and servicing DirecTV equipment, but disputes that these were the only training materials since the evidence demonstrates that the HSPs design and implement their own training programs and provide all training related to HR and pay policies (Defendants' Response to Plaintiffs' SOF, Doc. No. 391 at ¶ 21(n)).

DirecTV requires HSP technicians to display a badge identifying themselves as authorized DirecTV installers; wear no less than the approved DirecTV shirt, jacket, cap and pants; and adhere to DirecTV's Personal Grooming Standards.[14] DirecTV further requires that no less than 70 percent of all work orders performed be carried out by technicians driving vehicles meeting DirecTV's standards - new or like-new, damage-free, OSHA-compliant, white van or trucks with matching, white truck-bed shells. DirecTV logos must be displayed on all vehicles operating under the authority of an HSP Agreement as well as the HSP contractor's name and phone number as a service provider for DirecTV.

The Agreements require HSPs to "acquire, install and maintain on-line access to DirecTV's technician scheduling and management systems … for purposes of inputting and receiving Work Orders and other information from DirecTV." DirecTV's scheduling and work order management system is known as Siebel. The Siebel database contains the names of every technician who installs or services DirecTV satellite equipment and their unique "Tech ID Number," skill qualifications, technical training certification status, designated service region, and availability to receive work orders.

HSPs were required to "outfit all employee technicians with a laptop computer or other approved web-based, handheld device capable of receiving, modifying and closing Work Orders in the field by such employee technician." HSPs were also required to ensure that each technician had the ability to communicate, via cell phone, with both the HSP's dispatch office as well as DirecTV call center representatives while performing services.

The work flow process begins when a customer agrees to buy DirecTV services. DirecTV inputs the sales order into Siebel. Siebel processes the order, which consists of the specific

---

[14] DirecTV disputes this and contends that the HSPs set uniform and grooming policies that were separate and apart from the requirements in the HSP Agreements (Defendants' Response to Plaintiffs' SOF, Doc. No. 391 at ¶ 21(k)).

equipment and programming ordered by the customer, and assigns the work order. The parties dispute how the assignments are made. Plaintiffs contend DirecTV schedules the work order with a particular technician based on skill set, location and availability, whereas DirecTV asserts the work order is assigned to the office (either an HSP or DirecTV) responsible for the customer's zip code. Plaintiffs concede that the HSPs have the ability to reschedule jobs within Seibel.

DirecTV required technicians, including HSP technicians, to call their morning appointments by 8:30 a.m. and their afternoon appointments by 12:30 p.m., and dictated certain tasks that they had to complete before starting their work day, i.e., reviewing and acknowledging daily activities, reviewing the day's equipment needs, and mapping the customer's address. Technicians had to "status" themselves by notifying DirecTV of their arrival on site at a customer's location. DirecTV determined which days of the week and holidays DirecTV service would be offered. The parties dispute DirecTV's control over work hours, the length of technician shifts and the boundaries of the work day.

**IV.    Discussion**

The FLSA requires employers to pay a minimum wage and overtime to employees who work in an enterprise engaged in commerce. 29 U.S.C. §§ 206, 207. The existence of an employer-employee relationship is a prerequisite to an FLSA claim. See id. at §§ 201-219 (referencing employer and employee); see also Childress v. Ozark Delivery of Missouri LLC, 95 F. Supp.3d 1130, 1138-39 (W.D. Mo. 2015). The Act broadly defines an employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee...." Id. at § 203(d). Under the FLSA, two or more employers may employ a person jointly, and each

joint employer is individually responsible for complying with the FLSA with respect to the entire employment. Childress, 95 F. Supp.3d at 1138-39 (citing 29 C.F.R. § 791.2).[15]

The Eighth Circuit has not established a test to determine whether an entity is a joint employer under the FLSA; however, several courts in this Circuit have been guided by the following four factors: (1) the power to hire and fire employees: (2) supervision and control of employee work schedules or conditions of employment; (3) determination of the rate and method of payment; and (4) maintenance of employment records. See, e.g., Thornton v. Charter Commc'ns, LLC, No. 4:12CV479 SNLJ, 2014 WL 4794320, at *9 (E.D. Mo. Sept. 25, 2014); Lochiano v. Compasionate Care, LLC, No. 10–01089–CV–W–DGK, 2012 WL 4059873 (W.D. Mo. Sept. 14, 2012); McClean v. Health Sys., Inc., No. 11–03037–CV–S–DGK, 2011 WL 2650272, at *2 (W.D. Mo. July 6, 2011); Schubert v. Bethesda Health Group, Inc., 319 F. Supp.2d 963, 971 (E.D. Mo. 2004). No one factor is dispositive; courts examine the "economic realities" of the working relationship rather than technical definitions relating to employment, Goldberg v. Whitaker House Coop., Inc., 366 U.S. 28, 33 (1961); Rikard v. U.S. Auto Prot., LLC, No. 4:11CV1580 JCH, 2013 WL 5298460, at *3 (E.D. Mo. Sept. 20, 2013); Saunders v. Ace Mortgage Funding, Inc., No. CIV. 05–1437DWFSRN, 2007 WL 4165294, at *4 (D. Minn. Nov. 16, 2007); Dole v. Amerilink Corp., 729 F. Supp. 73, 76 (E.D. Mo. 1990), with the level of control the alleged employer has over significant aspects of the plaintiff's employment central to the determination of employer status. See Matrai v. DirecTV, LLC, 168 F. Supp.3d 1347, 1352-53 (D. Kansas 2016); Jensen v. AT & T Corp., No. 4:06–CV–842 (CEJ), 2007 WL 3376893, at

---

[15] 29 C.F.R. § 791.2(b)(3) provides that "[w]here the employee performs work which simultaneously benefits two or more employers, … a joint employment relationship generally will be considered to exist in situations such as: (3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer."

*2 (E.D. Mo. Nov. 13, 2007); Solis v. Hill Country Farms, Inc., 808 F. Supp.2d 1105, 1115 (S.D. Iowa 2011) aff'd, 469 Fed.Appx. 498 (8th Cir. 2012); Saunders, 2007 WL 4165294, at *4.

The joint employer analysis is "inherently fact intensive" because it requires an assessment of the record in light of multiple factors. As such, the issue of joint employment is often not suitable for resolution by summary judgment. See Barfield v. New York City Health & Hosp. Corp., 537 F.3d 132, 143-44 (2d Cir. 2008) ("Because of the fact-intensive character of a determination of joint employment, we rarely have occasion to review determinations made as a matter of law on an award of summary judgment.").

In support of their motion, Plaintiffs rely on Perez v. Lantern Light Corp., No. C12-01406 RSM, 2015 WL 3451268, at *1 (W.D. Wash. May 29, 2015), a case brought by the Secretary of Labor on behalf of installer-technicians employed and trained by DirecTV HSP Lantern Light Corporation d/b/a/ Advanced Information Systems ("AIS"). There, the Secretary argued that DirecTV's "pervasive" control over "nearly every facet of employment, from employment eligibility to work schedule to performance standards, including dress and manner of customer communication," rendered DirecTV the de facto employer of AIS's employees and thus liable for unpaid minimum wage and overtime compensation. Id. at *4. DirecTV claimed it engaged with AIS management on personnel matters only to ensure a high-quality experience on behalf of its customers, without interest in matters such as hiring and firing, scheduling, payroll, or any other joint employment standard. Id.

The Perez court analyzed these arguments under the four "regulatory" factors of Bonnette v. California Health and Welfare Agency, 704 F.2d 1465, 1470 (9th Cir. 1983)[16] and the "non-

---

[16] The factors described in Bonnette include whether the alleged employer:

(1) had the power to hire and fire the employees;
(2) supervised and controlled employee work schedules or conditions of employment;

regulatory" eight-factor framework set out in Torres-Lopez v. May, 111 F.3d 633, 640 (9th Cir. 1997),[17] and concluded that DirecTV was a joint employer of the AIS installers as a matter of law. Id. at *17.

The Perez court found AIS's "near singular reliance" on revenue from DirecTV to be particularly significant to its analysis, noting "evaluation of a company's power over the employment relationship must take into account its control over the purse strings" as a measure of control." Id. at *5. Here, Plaintiffs claim that under the terms of the HSP Agreements, DirecTV required technicians to work exclusively on DirecTV work orders and prohibited HSPs from seeking business from other cable companies. This, according to Plaintiffs, left the technicians economically dependent on DirecTV, giving DirecTV unquestioned authority over their conditions of employment.

DirecTV relies on several cases in which the courts determined, by summary judgment, that technicians supplied to cable or satellite television providers pursuant to a contract with

---

(3) determined the rate and method of payment; and
(4) maintained employment records.

Bonnette, 704 F.2d at 1470.

[17] Under the Torres–Lopez economic reality test, the Court considers the following "non-regulatory" factors:

(1) whether the work was a specialty job on the production line;
(2) whether responsibility under the contracts between a labor contractor and an employer pass from one labor contractor to another without material changes;
(3) whether the premises and equipment of the employer are used for the work;
(4) whether the employees had a business organization that could or did shift as a unit from one worksite to another;
(5) whether the work was "piece work" and not work that required initiative, judgment or foresight;
(6) whether the employee had an opportunity for profit or loss depending upon the alleged employee's managerial skill;
(7) whether there was permanence in the working relationship; and,
(8) whether the service rendered is an integral part of the alleged employer's business.

Torres–Lopez, 111 F.3d at 640.

another company were not jointly employed by the cable providers. See Thornton, 2014 WL 4794320; Zampos v. W & E Commc'ns, Inc., 970 F. Supp. 2d 794 (N.D. Ill. 2013); Valdez v. Cox Commc'ns Las Vegas, Inc., No. 2:09-CV-01797 PMP-RJJ, 2012 WL 1203726 (D. Nev. Apr. 11, 2012); Lawrence v. Adderley Indus., Inc., No. CV-09-2309 (SJF), 2011 WL 666304 (E.D. N.Y. Feb. 11, 2011); Jacobson v. Comcast Corp., 740 F. Supp. 2d 683 (D. Md. 2010). In each of these cases, the court determined that the control exercised by the cable providers over the technicians stemmed from the nature of the cable provider business and the need to provide reliable service to customers, not the nature of the relationship between the technician and the cable provider, and thus did not establish joint employment by the cable provider. See Thornton, 2014 WL 4794320, at *15-16; Zampos, 970 F. Supp. 2d at 803-05; Valdez, 2012 WL 1203726, at *6; Lawrence, 2011 WL 666304, at *8, 10; Jacobson, 740 F. Supp. 2d at 690-91.

For example, in Thornton, the court found that measures such as tracking on-time arrivals, assistance with billing and activation for Charter customers, and requiring technicians follow Charter technical specifications when installing Charter equipment, are "typical in a contractor relationship and do not establish joint employment." 2014 WL 4794320, at *15.

In Zampos, the plaintiffs argued that Comcast exercised supervision and control over the technicians' conditions of employment because it generated all the work performed by technicians, provided routing software, monitored technician work performance, and maintained employment records. 970 F. Supp. 2d at 803. The court rejected plaintiffs' argument, finding it "largely ignores the difference between affecting work performance as opposed to exercising supervision or control." Id. Further, the court stated that "[q]uality control and compliance-monitoring that stems from the nature of the business - that is, from the nature of the goods or services being delivered - are qualitatively different from control that stems from the nature of

the relationship between the employees and the putative employer." Id. at 803-04 (internal quotation marks and citations omitted).

Similarly in Lawrence, the district court found the fact the defendant cable company required the technicians to follow certain guidelines and specifications did not weigh in favor of a joint-employer relationship because "[i]t is in the nature of a contract that the contractor … promises to deliver the performance bargained for by the client." 2011 WL 666304 at *8. The requirement that technicians undergo background checks and wear identification badges was motivated by "good business sense" and the "nature of the business" and not any economic reality of an employer-employee relationship. Id; see also, Jacobson, 740 F. Supp. 2d at 691 ("detailed instructions and a strict quality control mechanism will not, on their own, indicate an employment relationship").

The precise issue before the Court - whether DirecTV is the joint employer of HSP technicians - has been addressed by district courts in other circuits on similar facts with varying results. In Roslov, 2016 WL 6892110, the court granted summary judgment in favor of DirecTV, finding it had little role in hiring service provider technicians aside from establishing minimum requirements. Id. at *8. The court further found that aside from quality control guidelines, DirecTV did not sufficiently control the technician's daily activities, noting the technician had flexibility throughout his day and could decide what he would work on or how he would work. Id. Regarding pay structure, there was no evidence that DirecTV mandated or controlled the technician's pay, and "significant" evidence that the service provider controlled it. Id. Lastly, DirecTV did not maintain any employment records for technicians other than onsite status data. Id. at *9.

In comparison, the court in Lang v. DirecTV, Inc., 801 F. Supp. 2d 532 (E.D. La. 2011), found a number of disputed issues of material facts regarding DirecTV's control over plaintiffs which precluded summary judgment, including whether it was DirecTV's policy to fire technicians who did not work evening shifts, whether plaintiffs received publications from DirecTV specifying how technicians were required to perform a wide variety of tasks, the degree of discretion plaintiffs retained in performing their jobs, and whether plaintiffs were "charged back" more than they earned on particular jobs. Id. at 536-36. See also Thompson, No. 3:07-00412, Doc. 995 at 5 (denying motion for summary judgment as to the joint employer issue "because of the existence of numerous genuine issues of material facts"); Field, Case No. 14-4427 (same).[18]

Of course, it is difficult to generalize from the case law because the courts are not consistent in the degree of emphasis they place on the different factors in the joint employer analysis. Lang, 801 F. Supp. 2d at 536; see also Roeder, 2017 WL 151401 at *10 ("Because this is a fact-intensive 'individualized inquiry,' the cases cited by the parties have limited value in determining whether there is a genuine issue of material fact."). Careful consideration of the facts presented in the parties' motions reveals substantial factual disputes and contested inferences that preclude summary judgment on the parties' employment relationship. Although both sides argue the undisputed facts support their respective positions, they go to great lengths, in voluminous filings, to dispute the other's factual statements, and plainly disagree over which facts and inferences are significant in the four factor analysis of the economic reality test, as discussed below.

---

[18] Plaintiffs also rely on a recent order in Roeder, 2017 WL 151401, denying the parties' cross motions for summary judgment on the employment question and other liability issues. However, the court did not consider whether DirecTV was a joint employer of the plaintiff because the parties agreed that during the relevant time period, he was engaged as an independent contractor by the service provider. Id. at *26.

**Power to hire and fire**

Plaintiffs contend that DirecTV controls the hiring of HSP technicians to the extent it sets technician requirements for training, certification, drug screening, and criminal background checks. Plaintiffs further contend that DirecTV has the power to constructively terminate installers by no longer assigning them work. DirecTV denies having this power or authority to hire or fire and notes that Plaintiffs specifically testified they were interviewed and hired by their HSP employers, not DirecTV (see, e.g., Deposition of Robert Guice ("Guice Depo."), Doc. No. 347-8 at 28:12-29:23; 31:2-11; 31:22-32:1; Deposition of Robert Ellendorf ("Ellendorf Depo."), Doc. No. 342-1 at 30:5-24). Further, Plaintiffs Guice and Ellendorf testified they were terminated by their HSP supervisors (Guide Depo. at 184:5-10; Ellendorf Depo. at 73:14074:11; 95:14-23); Plaintiff Parr notified Multiband of his resignation (Deposition of Steven Parr ("Parr Depo."), Doc. No. 351-1 at 25:25-26:14). DirecTV does not deny that it requires HSPs to screen applicants, which it argues is done in the context of quality control and not indicative of joint employment status, but disputes that the Agreements authorized it to determine whether applicants passed or failed such screenings. Moreover, DirecTV suggests these screening policies were not consistently complied with. (See Defendants' Response to Plaintiffs' SOF, Doc. No. 391 at ¶ 21(j)). The Court finds genuine issues of material fact impact this factor.

**Supervision and control**

The evidence of record shows DirecTV exercised some supervision and control over Plaintiffs' work schedules and conditions of employment, but there remains a genuine factual dispute regarding the extent of that control. It is uncontroverted that DirecTV installation jobs, initiated on customer request, were scheduled by DirecTV through its Siebel system and distributed to HSPs in the form of daily work orders. DirecTV assigned work orders to specific

technicians based on task duration and estimated travel time between customer locations combined with other information the HSPs were required to load into Siebel, i.e., technician skill qualifications, technical training certification status, work schedules, designated service region, and starting location. DirecTV disputes this, asserting that the initial work order assignments are "preliminarily" or "generically" assigned based on information provided by the HSPs, and that the HSPs often reassigned work orders in their discretion. Ellendorf acknowledged that jobs were reassigned to him from other technicians and vice versa "quite often" by his MasTec supervisor (Ellendorf Depo. at 83:1-10), and Parr testified that his supervisors reassigned orders if he could not complete all of his assignments or when a technician was sick (Parr Depo. at 114:15-18; 122:20-123:4). Guice testified that his DirectSat supervisors would manipulate his home address in his handheld device to assign him work orders "out where the work is." (Guice Depo. at 53:12-54:6)

Plaintiffs further claim DirecTV monitored or "tracked" technicians through its Siebel system. For instance, technicians were required to notify DirecTV of their arrival at a customer's location, record start and stop times, and notify DirecTV when a work order was completed. DirecTV does not dispute that it had the ability to track technicians through Siebel, but disputes that it actually did so. As additional evidence of its lack of control over the terms and conditions of technicians' employment, DirecTV points to the fact that different MasTec and Multiband locations were unionized at different times, and that it had no involvement in collective bargaining negotiations with the unions.

There are also factual disputes as to whether DirecTV-employed technicians and HSP-employed technicians receive the same training and install the same DirecTV systems under the same DirecTV policies and procedures, and whether HSPs have their own policies regarding

driving safety, appearance of personnel, timesheet practices, attendance, discipline and termination, and vehicle maintenance.

**Determination of rate and method of payment**

There is no dispute that each HSP had its own compensation and pay policies and that DirecTV did not directly pay Plaintiffs; however, Plaintiffs contend that as a matter of economic reality, DirecTV impacted their rate and method of pay because their compensation was based on a fixed percentage of the piece rate paid by DirecTV to the HSPs for completed work orders. DirecTV denies any involvement in determining the rate of payment for technicians, relying on the fact that the HSP Agreements do not state how much of the payments set forth on the Rate Matrix should be allocated to technicians in pay. The Court finds there are factual disputes concerning DirecTV's influence on the rate of pay, and specifically whether HSPs consult with DirecTV on how it pays its technicians or whether DirecTV instructs HSPs on how or what to pay its technicians.

**Maintenance of employment records**

Plaintiffs do not dispute that DirecTV does not "maintain" personnel files, payroll records, performance evaluations, benefits information, or any other "employment records" of HSP employees; however, Plaintiffs contend that DirecTV has full access to such records (see, e.g., Plaintiffs' Response to Defendants' Statement of Uncontroverted Facts, Doc. No. 421 at ¶ 322). The HSPs maintain personnel records on their own employees, including documents regarding hiring, termination and payroll, and tax records. Moreover, pursuant to the HSP Agreement, the HSPs were required to have available for DirecTV's inspection the results of

technicians' background checks, drug tests, social security verification and DMV checks.[19] Plaintiffs further claim that DirecTV maintained its own records on technicians in Siebel, including their unique "Tech ID Number," work schedule, skill set, background test and drug screen information, and professional certifications, which Plaintiffs characterize as payroll information. DirecTV disputes this, arguing that all of this information is provided to DirecTV by the HSPs (not the technicians) and the technicians' work order history. The Court finds there are genuine issues of material fact regarding DirecTV's recordkeeping and maintenance of employment records.

## V.     Conclusion

In sum, there are genuine disputes regarding the material facts necessary to an analysis of the factors indicative of joint employment. The Court cannot make credibility and factual determinations on a summary judgment motion. For this reason, the parties' cross-motions for summary judgment will be denied.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motions for Summary Judgment on the Basis That They Were Not the Joint Employer of Mastec Employee Robert Ellendorf [340], DirectSat Employee Robert Guice [344], and Multiband Employee Steven Parr [348], are **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Partial Summary Judgment on DirecTV, LLC's Employment Relationship [361] is **DENIED.**

---

[19] Plaintiffs dispute these were the only records the HSPs were required to have available for DirecTV (See, e.g., Plaintiffs' Response to Defendants' Statement of Uncontroverted Facts, Doc. No. 421 at ¶ 321).

_____
**JOHN A. ROSS
UNITED STATES DISTRICT JUDGE**

Dated this 31ˢᵗ day of March, 2017.